UNITED STATES of America,
Plaintiff,

v.

NEWDUNN ASSOCIATES, Orion Associates, and Northwest Contractors Corporation, Defendants.

Dennis H. Treacy, Director Commonwealth of Virginia Department of Environmental Quality, and State Water Control Board, Plaintiffs,

v.

Newdunn Associates, L.L.P.,

Nos. CIV.A. 2:01CV508,
CIV.A. 4:01CV86.

United States District Court,
E.D. Virginia,
Norfolk Division.

April 3, 2002.

United States of America, Michael Anson Rhine, Esq., Craig Paul Wittman,

Esq., U.S. Attorney's Office, Norfolk, Steven Edward Rusak, Esq., Kent Edmund Hanson, Esq., U.S. Department of Justice, Environmental Defense, Environment and Natural Resources Division, Washington, DC, John Kenneth Byrum, Jr., Esq., Rick Randall Linker, Esq., Office of the Attorney General, Richmond, for Plaintiffs.

Mark Randolf Baumgartner, Esq., Richard Hoyt Matthews, Esq., Douglas Eugene Kahle, Pender & Coward, Virginia Beach, for Defendants.

### OPINION AND ORDER

MORGAN, District Judge.

The parties come before the Court in these consolidated cases for a non-jury trial, seeking to resolve issues surrounding the Defendant's activities on the forty three (43) acre parcel of land located at the intersection of Industrial Park Drive and Jefferson Avenue in Newport News, Virginia (the "Property" or the "Newdunn Property"). At the conclusion of the trial on March 8, 2002, the Court ruled from the bench that the United States Army Corps of Engineers (the "Corps") did not have jurisdiction to regulate the Property. The Court also ruled that Plaintiff Dennis Treacy ("Treacy"), Director of the Virginia Department of Environmental Quality ("VDEQ"), acting on behalf of the State Water Control Board (the "Board"), possessed no jurisdiction over the Property independent of the Corps' claim of jurisdiction. This order further explains the reasoning of the Court's decision.

### I. Factual and Procedural Background

Newdunn Associates, LLP ("Newdunn" or the "Defendants") is the owner of the Property at issue in this case. On May 21, 2001, the Corps issued a second jurisdictional determination that the Newdunn Property contained wetlands which are waters of the United States and any filling would require a "404 permit," pursuant to Section 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344(a). From approximately June 12, 2001 through July 12, 2001, Newdunn and/or persons acting on their behalf, conducted, contracted for, supervised and/or otherwise controlled the discharge of dredged or fill material onto the Newdunn Property without a permit under CWA section 404. On June 14, 2001 and June 16, 2001, the Corps issued a cease and desist order to the Defendants. On June 25, 2001, the Board issued Newdunn an Emergency Special Order ("ESO") directing Newdunn Associates to cease all excavation on the Property. Believing that the Corps lacked jurisdiction over the Property and that their activities did not violate state law, the Defendants elected not to comply with these orders.

On July 6, 2001, the United States filed a Complaint in *United States v. Newdunn Associates, et. al.*, Civil Action No. 2:01cv508, seeking *inter alia* an injunction barring the Defendants from discharging dredged or fill material into the Property without a permit. On July 13, 2001, the Court granted the motion by the United States for a Temporary Restraining Order ("TRO") enjoining the Defendants from conducting any filling or related activity on the Property for a period of ten (10) days. On July 23, 2001, after conducting an evidentiary hearing and viewing the Property, the Court granted a Preliminary Injunction ("PI") with significant modifications to the July 13, 2001 TRO. With certain conditions regarding, amongst other things, the maintenance of a buffer strip of wetlands on the perimeter of the Property and the construction of a ditching system to minimize surface water runoff, the Court lifted the prohibition on the Defendant's activities. The Court indicated at that time that the paramount issue in this case was whether the Corps had jurisdiction to regulate the Property.

From late July, 2001 through approximately September 30, 2001, Defendants and/or persons acting on their behalf conducted, contracted for, supervised and/or otherwise controlled the use of mechanized land-clearing and earth moving equipment to discharge dredged or fill material into a portion of the wetlands on the Newdunn Property.

On July 30, 2001, the Court filed a written Order explaining the July 23, 2001 Preliminary Injunction. The Corps, unsuccessful in its attempt in this Court to enjoin Newdunn's filling activities, then conferred with the state regulatory body, the VDEQ. The day after the Court entered the Preliminary Injunction, Treacy notified Newdunn that it could not excavate ditches on the Property [1] and followed this notice with a civil action in the Circuit Court of the City of Newport News, Virginia, seeking to enjoin the excavation ordered by this Court [2]. Prior to VDEQ's filing this state court claim, Newdunn filed *Newdunn Associates, L.L.P. v. Dennis H. Treacy and Bert W. Parolari, Jr.*, Civil Action No. 2:01cv575, in which Newdunn sought to enjoin Treacy and Parolari, as state officials, from proceeding with plans to seek injunctive relief in state court regarding Newdunn's ditching activities on the Property. On August 8, 2001, Newdunn also filed a petition to remove the state action to this Court, which had been designated *Dennis H. Treacy and State Water Control Board v. Newdunn Associates, L.L.P.*, Civil Action No. 4:01cv86.

In an Order entered in Civil Action No: 2:01cv575 on August 9, 2001, this Court issued a TRO enjoining Treacy and Parolari from instituting any proceeding in state court against Newdunn relating to activities authorized by the PI and ordered them to appear and show cause why such state court proceeding would not be controlled by Civil Action No. 2:01cv508, which was pending in this Court. In a tele-conference hearing held on August 10, 2001, this Court rejected the state's request to dissolve or modify this TRO.

On August 8, 2001, Treacy and Parolari moved to dismiss *Newdunn v. Treacy, et. al.*, Civil Action No. 2:01cv575. On August 17, 2001, the United States filed a Motion to Enforce the Preliminary Injunction in *United States v. Newdunn, et. al.*, Civil Action No. 2:01cv508. On August 20, 2001, Newdunn moved in Civil Action No. 2:01cv575 to convert the August 9, 2001 TRO into a PI. The Court heard evidence and arguments on these interrelated motions on August 20, 2001 [3]. In an Order

---

1. In July, 2001, the statute upon which the VDEQ relied, Va.Code §§ 62.1–44.5 and 62.1–44.15:5, did not prohibit the filling of wetlands. As conceded by the VDEQ, as of July, 2001, this statute only barred the excavation of wetlands. The portion of the statute prohibiting excavation became effective July 1, 2000 in accord with normal scheduling of effective dates by the Virginia legislature. However, the statute specifically contains a delayed effective date for the prohibition of filling wetlands until October 1, 2001, thereby intentionally creating a window of opportunity for owners, such as Newdunn, to fill property alleged to be wetlands.

2. The City of Newport News had also previously and conditionally approved excavation on the Property as part of a drainage plan. When it was brought to the Court's attention

that a more extensive ditching plan had been ordered by the City of Newport News, by modification of its Preliminary Injunction in Civil Action No. 2:01cv508, on August 22, 2001, the Court permitted the more extensively and presumably more scientifically sound system of ditching approved by the City of Newport News to be substituted for the Court's ditching plan.

3. At the August 20, 2001 hearing, counsel for VDEQ issued a thinly veiled threat that, should the Court lift the TRO, it would proceed with other legal actions against Newdunn, including possible criminal actions. When pressed further by the Court, VDEQ counsel, an Assistant Attorney General, refused to either confirm or deny that criminal action was contemplated. Given the com-

filed August 22, 2001, the Court extended the TRO for an additional 10 days, ordered Newdunn to obtain a bond with sufficient surety or obtain an appropriate letter of undertaking from a bank in the principal sum of one-hundred and fifty thousand dollars to cover the potential cost of reversing its excavation activities and ordered a hearing upon Newdunn's request for a Preliminary Injunction be held on August 30, 2001. Further, the Court dismissed Parolari as a party to the suit.

On August 23, 2001, Treacy moved to remand Civil Action No. 4:01cv86 to the Newport News Circuit Court. The Court heard arguments on this motion as well as Newdunn's motion to convert the August 9, 2001 TRO to a Preliminary Injunction on August 30, 2001. In an Order filed August 31, 2001 in Civil Action No:201cv575, the Court found preliminarily that (1) Treacy relied on the Corps' assertion of jurisdiction over the Property via the CWA in his attempt to assert jurisdiction to enjoin the excavation of ditches and, (2) Treacy's proffered evidence was insufficient to establish that Newdunn's filling and subsequent excavation activities authorized in the Court's July 30, 2001 Preliminary Injunction was in violation of state statute, Va.Code §§ 62.1–44.5 and 62.1–44.15:5, and (3) as of October 1, 2001, Treacy had independent jurisdiction over further filling activity provided that Treacy also had independent jurisdiction over the Property. Further, the Court converted the TRO into a Preliminary Injunction with modifications, and thereby enjoined Treacy from instituting any proceeding in state court against Newdunn related to activities authorized by the Corps' Preliminary Injunction issued by the Court on July 30, 2001 and modified on August 22, 2001 in Civil Action 2:01cv508. The Court

set an expiration date for the Treacy Preliminary Injunction of October 1, 2001.

In an Order filed September 5, 2001 in Civil Action No. 4:01cv86, the Court again found that Treacy relied on the Corps' assertion of jurisdiction over the Property via the CWA in his attempt to assert jurisdiction to enjoin the excavation of ditches. In that Order the Court denied Treacy's Motion to Remand.

On October 4, 2001, the Board affirmed the Emergency Special Order ("ESO") and held that Newdunn was in violation of Va.Code § 62.1–44 *et seq.* The Board issued a Final Special Order ("FSO") on October 11, 2001 ordering Newdunn to cease its activities on the Property. Both the ESO and FSO listed as the first Finding of Fact that the Corps had jurisdiction over the Property under the CWA.

On October 26, 2001, Treacy moved for Voluntary Dismissal Without Prejudice of Civil Action No. 4:01cv86. On October 29, 2001, Newdunn moved to Consolidate Civil Action No. 2:01cv 508 and Civil Action No. 4:01cv86. On November 7, 2001, Newdunn moved for a Preliminary Injunction to prevent VDEQ from taking any further state administrative actions involving Newdunn's activities on the Property before October 1, 2001. On November 7, 2001, Treacy moved for partial summary judgment against Newdunn on the issue of liability based upon the outcome of the state administrative hearings. The Court held a hearing on these matters on December 11, 2001. In an Order filed December 21, 2001, the Court adhered to its finding that Treacy's exercise of jurisdiction was dependent upon the Corps' alleged jurisdiction under the CWA. Further, the Court (1) denied Treacy's Motion to Voluntarily Dismiss without Prejudice Civil Ac-

plexities of these civil actions, the Court found that the threat of criminal proceedings placed

Newdunn in an untenable position.

tion No. 4:01cv86, (2)granted Newdunn's Motion to Consolidate Civil Action No. 2:01cv 508 and Civil Action No. 4:01cv86, (3) declined to consider Treacy's Motion for Partial Summary Judgment because Treacy failed to file a statement of undisputed facts as required by Local Rule 56(B), and (4) denied Newdunn's Motion for Preliminary Injunction. Further, the Court ordered all parties to arrange a Settlement Conference with a Magistrate Judge of this Court. The Court ordered that each party be represented at said settlement conference by someone with authority to settle the case or that such a person be readily available via telephone during the conference [4].

On February 1, 2002, the Corps filed a Motion for Partial Summary Judgment. On February 8, 2001, the Board issued a Supplemental Final Special Order ("SFSO") finding that Newdunn's activities on the Property prior to October 1, 2001 were in violation of state law. On February 13, 2002, Treacy filed a Motion for Summary Judgment based on this SFSO. The Corps' Motion for Partial Summary Judgment and Treacy's Motion for Summary Judgment were not considered by the Court, as they did not mature within a reasonable time before the date of trial.

The bench trial in this case began on March 4, 2002. The Corps argued that a "surface water" or "hydrological" connection exists between the wetlands on the Property and other Waters of the United States, as defined in Corps' regulations, and therefore the Corps had jurisdiction over the Property. Treacy argued that Newdunn violated Va.Code §§ 62.1–44.15:5 and 62.1–44.5 and that Treacy possessed jurisdiction over the Property independent of the Corps. Newdunn contended that the Corps' regulations exceeded the au-

thority granted under the CWA and, in the alternative, that the Corps did not properly exercise jurisdiction under their own regulations. Newdunn also argued that Treacy possessed no jurisdiction independently of the Corps and, in the alternative, Newdunn did not violate the state statute. The Court ruled from the bench on March 8, 2002. The court indicated it was ruling for the Defendants, but that it would not enter judgment until a written opinion and order was filed.

## II. Findings of Fact

1. In September and October of 1997, the Williamsburg Environmental Group, Inc. ("WEG"), an environmental consulting firm, performed a wetland delineation on the Newdunn Property at the request of Newdunn Associates. WEG determined that most of the Property constituted wetlands.

2. In September of 1999, another environmental consultant, Doug Davis of Davis Environmental Consultants, acting on behalf of Newdunn Associates, requested a jurisdictional determination and confirmation of wetlands delineation from the Corps. On December 16, 1999, the Corps provided Newdunn with a formal jurisdictional determination that the Property contained wetlands which it believed were subject to CWA jurisdiction. The Corps also confirmed the wetland delineation submitted by Davis at this time. A determination that a property contains wetlands is defined as a delineation in Corps regulations. A determination by the Corps that it has jurisdiction over wetlands previously delineated is a separate decision.

3. On May 21, 2001, before Newdunn began the filling activities, the Corps issued a second jurisdictional determination

4. The Settlement Conference was held on January 24, 2002. The parties were unable to settle the matters before the Court.

that the Property contained wetlands which are waters of the United States. Although the Supreme Court's decision in *Solid Waste Agency of N. Cook County v. United States Army Corps of Engineers,* 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) (*SWANCC*) was decided between the Corps' December 16, 1999 determination of jurisdiction and its May 21, 2001 determination, it looked at the same factors in both determinations.

4. Before Newdunn and its contractors commenced work on the Property in early June 2001, the Property contained approximately thirty-eight (38) acres of non-tidal forested wetlands.

5. From approximately June 12, 2001 through July 12, 2001, the Defendants and/or persons acting on their behalf, conducted, contracted for, supervised and/or otherwise controlled the discharge of dredged or fill material onto the Property. From about July 23, 2001 through approximately September 20, 2001, the Defendants and/or persons acting on their behalf, conducted, contracted for, supervised and/or otherwise controlled the discharge of dredged or fill material onto the Property. From early June, 2001 through September, 2001, the Defendants or persons acting on their behalf conducted, contracted for, supervised, directed and/or otherwise controlled the mechanized stumping, grading and/or grubbing of the Property. From late July, 2001 through September, 2001, the Defendants or persons acting on their behalf conducted, contracted for, supervised, directed and/or otherwise controlled the mechanized excavation of ditches on the Property as indicated in the proposal dated May 11, 2001 which was executed by and between Orion and Newdunn and the "Drainage Improvements for Newdunn Associates, L.L.P." and submitted by Newdunn to the City of Newport News, Virginia. Newdunn conducted all of these activities without a permit under CWA § 404 or an individual or General Virginia Water Protection Permit under Va.Code §§ 62.1–44.15:5(D) and 62.1–44.5(A)(2).

6. Rain generated surface water runoff occasionally exits the Property through a spur ditch by the Property. There is no evidence of the frequency or volume of the surface water runoff. At prior hearings, the Corps had claimed a hydrological connection between the Property and Jones. Run, as well as a hydrological connection between the Property and a branch of Stony Run located to the east of highway I-64. However, these alternate hydrological connections were not proven at any pretrial hearings and no evidence of either alternate connection was presented at trial. Further, at prior hearings, the Corps had claimed that surface water runoff contributed to flooding in a low lying residential area to the east of the Property. Obviously, maintaining the status quo, as urged by the Corps, would not alleviate this problem and it was not mentioned at the trial. Although reference was also made in pretrial hearings to damage to plant and animal life which occupied the wetlands on the Property, no evidence on this issue was presented at trial by the Corps. There was a mention in the State Board's February 8, 2002 Supplemental Special Final Order ("SFSO") of potential damage to plant and animal life, but neither the Corps nor Treacy asserted this as a basis for jurisdiction. Thus, the Corps' claim of jurisdiction is based solely upon the alleged surface water or hydrological connection of the Property to the navigable portion of Stony Run and Treacy must base his claim of jurisdiction upon the enabling statute passed by the Virginia Legislature.

7. In order for the surface water which exits the Property to reach the navigable portion of Stony Run, it must traverse the following path:

A. Enter the spur ditch leading from the Property through the adjacent VDOT wetlands approximately forty (40) feet to a manmade, drainage ditch lying adjacent and parallel to the east side of I–64 ("eastern I–64 ditch"). The eastern I–64 ditch is ephemeral, or dry most of the year.

B. The surface water that continues through the eastern I–64 ditch intermittently travels approximately four hundred (400) feet in this ditch to a culvert, which runs under I–64.

C. The surface water that continues through the culvert under I–64 intermittently travels approximately one hundred (100) feet through this culvert to another manmade, drainage ditch, which lies on the western side of I–64 ("western I–64 ditch").

D. The surface water that continues through the western I–64 ditch intermittently travels approximately one and one third miles down the western I–64 ditch before intersecting the Western Arm of Stony Run.

E. The Western Arm of Stony Run, including the point where surface water from the western I–64 ditch intermittently enters the Western Arm of Stony Run, is not navigable-in-fact.

F. The Western Arm of Stony Run intersects with the Central Arm of Stony Run approximately one thousand (1,000) feet from the point where surface water from the western I–64 ditch may intermittently enter the Western Arm of Stony Run.

G. Old Courthouse Road passes over Stony Run approximately one mile downstream from the point where surface water from the western I–64 ditch may intermittently enter the Western Arm of Stony Run.

H. Stony Run is only navigable-in-fact downstream of the Old Courthouse Road overpass. The lower reaches of Stony Run are subject to the ebb and flow of the tide. The upper limits of tidal influence reach the Old Courthouse Road overpass.

I. Stony Run flows into the Warwick River, which intersects with the James River, which intersects with the Hampton Roads Harbor, which intersects with the Chesapeake Bay.

8. The evidence shows that the wetlands contained on the Property were nontidal high elevation hydric soil flats, which are qualitatively different and less functional than wetlands that lay closer to navigable, open water.

9. The Property averaged approximately forty six (46) feet above sea level in its natural state before any filling, ditching, grading or stumping activities began. It rested on one of the highest elevations in this generally low lying area. Thus, the wetlands on the Property did not serve to filter pollutants from I–64 or the surrounding area from entering the Chesapeake Bay. Rather, when surface water did exit the Property, it actually traveled to the drainage ditches of I–64.

10. The Corps and Treacy have presented no evidence of any pollution, other than silt from "clean fill," exiting from the Property. There is no evidence that the silt exiting the Property as a result of Newdunn's activities on the Property actually reaches any natural watercourse or causes harm to the Chesapeake Bay or any of its "natural" tributaries.[5]

---

**5.** In fact, the Corps' position may assist pollutants from I–64 entering the Chesapeake Bay. The Corps claims that it has jurisdiction over the Property because of a "surface water connection" from a ditch on the Property, to a drainage ditch on the eastern side of I–64, through a culvert under I–64, to a drainage ditch on the western side of I–64, to Stony Run, and, eventually, into the Chesapeake Bay. Under this scenario, the Corps only

11. The Corps first promulgated regulations for the CWA on April 3, 1974 ("1974" or "old" regulations). Subsequently, it put forth revisions in 1975, 1977, and 1986 ("1986" regulations).

12. The authority granted to the Corps by Congress has not been expanded since the Corps promulgated the 1974 regulations.

13. Both the 1974 and 1986 regulations share the definition for navigable waters: "The term 'navigable waters of the United States' and 'navigable waters,' as used herein mean those waters of the United States which are subject to the ebb and flow of the tide and/or are presently, or have been in the past, or may be in the future susceptible for use for purposes of interstate or foreign commerce." 33 C.F.R. 209.120(d)(1) (1974), 33 C.F.R. 321.2(a) (1986). Both sets of regulations include the same conditions that must be met to be considered a "navigable water." [6]

14. The 1986 regulations distinguish the applicability of the term "navigable waters" from the term "waters of the United States." The 1986 regulations state,

"The terms 'navigable waters of the United States' and 'waters of the United States' are used frequently throughout these regulations, and it is important from the outset that the reader understand the difference between the two. 'Navigable waters of the United States' are defined in 33 C.F.R. Part 329. These are waters that are navigable in the traditional sense where permits are required for certain work or structures pursuant to Section 9 and 10 of the Rivers and Harbors Act of 1899. 'Waters of the United States' are defined in 33 C.F.R. Part 328. These waters include more than navigable waters of the United States and are the waters where permits are required for the discharge of dredged or fill material pursuant to Section 404 of the Clean Water Act." 33 C.F.R. § 320.1(d) (1986).

The 1974 regulations make no such distinction.

15. The 1986 regulations state that the definition for "waters of the United States" applies to the authority of the Corps under the CWA. 33 C.F.R. § 328.1 (1986). It also clearly states that the definition for "navigable waters" "does not apply to au-

---

claims jurisdiction because of the existence of an alleged hydrological connection from I–64 to the Chesapeake Bay. Thus, in its quest to regulate the surface water and accompanying silt from the Property, the Corps has promoted and failed to alter the path of pollutants from I–64 to the Chesapeake Bay. Pollutants emanating from I–64 should potentially cause more damage to the Chesapeake Bay than the silt from the Property. Yet, in order to protect the Chesapeake Bay from these pollutants emanating from I–64, the Corps would have to alter the hydrological connection from I–64 away from a path that leads to the Chesapeake Bay. However, if it were to make such an alteration, the Corps would no longer have a "surface water" or "hydrological" connection from I–64 to the Chesapeake Bay. Without such a connection from I–64 to the Chesapeake Bay, the Corps would have to concede that it did not have jurisdiction over the Prop-

erty and similar property which are allegedly connected to the Chesapeake Bay via the ditches or culverts of I–64. Thus by attempting to maintain the status quo with regard to the Property both the Corps and Treacy are risking damage to the Bay. It was for this reason that the Court vigorously and repeatedly urged the parties to negotiate a settlement.

**6.** Specifically, the following conditions must be met:
"(1) Past, present, or potential presence of interstate or foreign commerce;
(2) Physical capabilities for use by commerce as in paragraph (a) of this section; and
(3) Defined geographic limits of the waterbody."
33 C.F.R. 209.260(b) (1974), 33 C.F.R. 329.5 (1986).

thorities under the Clean Water Act ...” 33 C.F.R. § 329.1(1986). Again, there is no such distinction in the 1974 regulations.

16. The 1986 regulations define the term “waters of the United States,” [7] which it states applies to the CWA jurisdictional limits, 33 C.F.R. § 328.1 (1986), in much broader terms than the definition for “navigable waters.”

17. The 1974 regulations state under “General Policies”that, “[t]he term ‘navigable waters of the United States’ is used to define the scope and extent of the regulatory powers of the Federal government.” 33 C.F.R. § 209.260(b) (1974). The 1986 regulations do not contain this statement.

18. In several places throughout the regulations, the 1986 regulations have substituted the term “waters of the United States,” where the old regulations had used “navigable waters.” These changes took place in otherwise identical sections of the new and old regulations. *See e.g.* 33 C.F.R. 209.120(b)(7) (1974) and 33 C.F.R. § 209.120(b)(7) (1986); 33 C.F.R. § 209.120(c) (1974) and 33 C.F.R. § 209.120(c) (1986); 33 C.F.R. § 209.120(d)(3) (1974) and 33 C.F.R. § 323.2(c) (1986); 33 C.F.R. § 209.120(e)(2) (1974) and 33 C.F.R. § 323.3(a) (1986).

19. The 1975 regulations, in its definition of “Navigable waters,” includes “All tributaries of navigable waters of the United States up to their headwaters and landward to their ordinary high water mark.” 33 C.F.R. 209.120(2)(i)(e) (1975).[8] The

---

7. The 1986 regulations use the following definition for “waters of the United States”:

(1) All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;

(2) All interstate waters including interstate wetlands;

(3) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters;

(i.) Which are or could be used by interstate or foreign travelers for recreational or other purposes; or

(ii.) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or

(iii.) Which are used or could be used for industrial purpose by industries in interstate commerce;

(4) All impoundments of waters otherwise defined as waters of the United States under the definition;

(5) Tributaries of waters identified in paragraphs (a)(1)-(4) of this section;

(6) The territorial seas;

(7) Wetlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (1)-(6) of this section.” 33 C.F.R. 328.3 (1986).

8. The Corps has argued in this case that the spur ditch, the I-64 drainage ditches, and the culvert all qualify as “tributaries” to “waters of the United States,” making these alleged tributaries also waters of the United States. However, the Corps has also expanded the definition of the term “tributary” since the 1974 regulations:

The 1974 regulations stated, “The term ‘navigable waters of the United States’ and ‘navigable waters,’ as used herein mean those waters of the United States which are subject to the ebb and flow of the tide, and/or are presently or have been in the past, or may be in the future susceptible for use for purposes of interstate or foreign commerce.” 33 C.F.R. § 209.120(d)(1) (1974).

The 1975 regulations stated, “(2) ‘Navigable waters.’(i) the term ‘navigable waters,’ as used herein for purposes of Section 404 of the Federal Water Pollution Control Act, is administratively defined to mean waters of the United States ... and shall include the following waters:

...

(e) All tributaries of navigable waters of the United States up to their headwaters and landward to their ordinary high water mark.

...

(i) Those other waters which the District Engineer determines necessitate regulation for the protection of water quality as expressed in the guidelines (40 CFR 230). For example, in the case of intermittent rivers, streams, tributaries, and perched wetlands that are not continuous or adjacent to navigable waters identified in paragraphs (a)-(h), a decision on jurisdiction shall be made by the District Engineer."

. . .

(ii) The following additional terms are defined as follows:

(e) 'Primary tributaries' means the main stems of tributaries directly connecting to navigable waters of the United States up to their headwaters and does not include any additional tributaries extending off of the main stems of these tributaries."

33 C.F.R. §§ 209.120(d)(2)(i)(e) & (i) and (d)(2)(ii)(e) (1975).

The 1975 preamble stated, "With respect to the inland areas of the country, Corps jurisdiction under Section 404 of the FWPCA would extend to all rivers, lakes, and streams that are navigable waters of the United States, to all tributaries (primary, secondary, tertiary, etc.) of navigable waters of the United States, and to all interstate waters.... Drainage and irrigation ditches have been excluded ...In view of manpower and budgetary constraints it is necessary that this program be phased in over a two year period.... Thus, under Phase I, this regulation would become immediately operative in all coastal waters and contiguous or adjacent wetlands as well as inland rivers, lakes and streams that are navigable waters of the United States ... and their contiguous or adjacent wetlands. In Phase II, which would begin on July 1, 1976, we would ... also begin to regulate discharges of dredged or fill material in primary tributaries (the main stems of tributaries directly connecting to navigable waters of the United States), their contiguous or adjacent wetlands, and all lakes. Finally, in Phase III, all discharges of dredged or fill material in navigable waters would be regulated after July 1, 1977." 40 Fed.Reg. 31,320–321 (1975).

The 1977 regulations stated, "(a) The term 'waters of the United States' means:

. . .

(3) Tributaries to navigable waters of the United States, including adjacent wetlands (manmade nontidal drainage and irrigation ditches excavated on dry land are not considered waters of the United States under this definition).

(4) Interstate waters and their tributaries, including adjacent wetlands;" 33 C.F.R. § 323.2(a)(3) and (4).

The 1982 regulations stated, "(a) The term 'waters of the United States' means[ ]:

(1) All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;

(2) All interstate waters including interstate wetlands;

(3) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters;

(i.) Which are or could be used by interstate or foreign travelers for recreational or other purposes; or

(ii.) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or

(iii.) Which are used or could be used for industrial purpose by industries in interstate commerce;

(4) All impoundments of waters otherwise defined as waters of the United States under the definition;

(5) Tributaries of waters identified in paragraphs (a)(1)-(4) of this section. 33 C.F.R. 323.2(a)(5) (1982).

The 1986 preamble stated, "For clarification, it should be noted that we generally do not consider the following waters to be 'Waters of the United States.' However, the Corps reserves the right on a case-by-case basis to determine that a particular waterbody within these categories of waters is a water of the United States. EPA also has the right to determine on a case-by-case basis if any of these waters are 'waters of the United States.'

(a) Non-tidal drainage and irrigation ditches excavated on dry land ... [I]n the absence of wetlands the upstream limit of the Corps jurisdiction also stops when the ordinary high water mark is no longer perceptible." 51 Fed.Reg. 41,217 (1986).

The 1990 preamble states, "The statement that non-tidal drainage ditches are waters of the United States if they extend the OHWM of an existing waters of the United States is consistent with the final rule published in the November 13, 1986 Federal Register and ap-

1975 regulations further define "Primary tributaries" as "the main stems of tributaries directly connecting to navigable waters of the United States up to their headwaters and does not include any additional tributaries extending off of the main stems of these tributaries." 33 C.F.R. § 209.120(d)(2)(ii)(e). The 1986 regulations do not have a definition of Primary tributaries, nor does it exclude "additional tributaries extending off of the main stems of these tributaries."

20. The 1975 preamble to the regulations states, "With respect to the inland areas of the country, Corps jurisdiction under Section 404 of the FWPCA would extend to all rivers, lakes, and streams that are navigable waters of the United States, to all tributaries (primary, secondary, tertiary, etc.) of navigable waters of the United States, and to all interstate waters." 40 Fed.Reg. 31,320–21 (1975).

21. The 1977 regulations stated that "Waters of the United States" means: "Tributaries to navigable waters of the United States, including adjacent wetlands (manmade nontidal drainage and irrigation ditches excavated on dry land are not considered waters of the United States under this definition) . . . . [and] Interstate waters and their tributaries, including adjacent wetlands." 33 C.F.R. 323.2(a)(3) and (4) (1977).

22. The 1982 regulations further expanded the definition of "Waters of the United States"[9]. See 33 C.F.R. 3232(a)(5) (1982).

23. The 1986 regulations include the following passage in the preamble: "For clarification, it should be noted that we generally do not consider the following waters to be 'Waters of the United States.'" However, the Corps reserves the right on a case-by-case basis to determine that a particular waterbody within these categories of waters is a water of the United States . . .

(a) Non-tidal drainage and irrigation ditches excavated on dry land." 51 Fed. Reg. 41,217 (1986).

24. As noted in the Court's Order of December 21, 2001, the VDEQ continually relied on the Corps' claim of jurisdiction in its attempts to regulate the Property. In a letter dated July 31, 2001 to Newdunn's counsel, VDEQ counsel wrote that VDEQ "will continue to view the wetlands on [the

plies to ditches constructed in waters or that connect waters. Nothing in the NWP notice was intended to change the November 13, 1986 Federal Register notice which states that drainage ditches constructed entirely in upland areas generally are not considered to be waters of the United States." ·65 Fed.Reg. 12,824–825 (2000).

**9.** The 1982 regulations use the following definition for "waters of the United States":

(1) All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;
(2) All interstate waters including interstate wetlands;
(3) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters;
 (i.) Which are or could be used by interstate or foreign travelers for recreational or other purposes; or
 (ii.) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or
 (iii.) Which are used or could be used for industrial purpose by industries in interstate commerce;
(4) All impoundments of waters otherwise defined as waters of the United States under the definition;
(5) Tributaries of waters identified in paragraphs (a)(1)-(4) of this section.
33 C.F.R. 323.2(a)(5) (1982).

Property] as wetlands subject to [state regulations] until Newdunn demonstrates that the property no longer contains wetlands, *either with a final determination from the Corps or court* that the activities that removed or covered the previously existing wetland parameters were *either authorized by the Corps or not subject to its jurisdiction or the jurisdiction of the Board.*" (emphasis added).

25. In the Emergency Special Order issued by the VDEQ on June 25, 2001, which ordered Newdunn not to excavate, the first Finding of Fact is that the Corps had determined that the Property is comprised of "jurisdictional wetlands subject to regulation under the CWA."

26. Even after the Court issued its August 31, 2001 Order, the VDEQ repeated this finding. After the October 4, 2001 hearing, the Board stated in a "Final Special Order" as its first Finding of Fact that "On December 16, 1999, the U.S. Army Corps of Engineers (ACOE) notified Newdunn Associates that it had determined that the majority of the Facility is comprised of jurisdictional wetlands subject to regulation under the Clean Water Act."

27. Not until the Board entered a Supplemental Special Final Order ("SFSO") on February 8, 2002, only weeks before trial, did the Board omit reference to its dependance upon Corps jurisdiction under the CWA.

## III. Conclusions of Law

1. The paramount issue in this case is whether the Corps has jurisdiction under the CWA and its regulations interpreting the Act over the wetlands on the Property under the holding in *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121,

106 S.Ct. 455, 88 L.Ed.2d 419 (1985) (*Riverside* ), in light of *SWANCC.*

2. The CWA was passed in 1972 in reaction to incidences involving heavily polluted waters, such as the burning of the Cuyahoga River cited in *SWANCC,* 531 U.S. at 175, 121 S.Ct. 675 (Stevens, J. dissenting). The overarching goal of the Act was "ending water pollution by 1985." *Id.* Following *Riverside,* courts generally allowed the act's jurisdiction to expand through Corps regulations and interpretation thereof until January of last year when the decision in *SWANCC* was announced. *SWANCC* recognized there is a limit to the Corps' unilateral expansion of the jurisdiction that the CWA conferred upon it.

3. The Supreme Court in *SWANCC* stated that "The term 'navigable' has at least the import of showing us what Congress had in mind as its authority for enacting the CWA: its traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be made so." *Id.* at 172, 121 S.Ct. 675. Justice Stevens cogently, if disapprovingly, described the effect of *SWANCC* when he wrote in his dissent, "[T]he Court draws a new jurisdictional line, one that invalidates the 1986 migratory bird regulation as well as the Corps assertion of jurisdiction over all waters except for actually navigable waters, their tributaries and wetlands adjacent to each." *Id.* at 176, 121 S.Ct. 675.

4. Justice Stevens also observed that *SWANCC* had the effect of excluding, amongst other waters, tributaries and wetlands that are not contiguous or adjacent to navigable waters from the scope of the Corps' jurisdiction. *Id.* at 188, fn. 14, 121 S.Ct. 675. Justice Stevens discussed three "phases" of waters. "Phase 1" waters, which are navigable waters and their contiguous wetlands, and "phase 2" waters, which are the "primary tributaries" [10] of

---

**10.** The Corps' 1975 regulations define "Primary tributaries" as "the main stems of tributaries directly connecting to navigable waters

of the United States up to their headwaters and does not include any additional tributar-

navigable waters and their adjacent wetlands, were still subject to the Corps regulation after *SWANCC* according to Justice Stevens. However, "phase 3" waters, which are "all other waters covered by the statute, and can include such isolated waters as intermittent rivers, streams, tributaries, and perched wetlands that are not contiguous or adjacent to navigable waters," *Id.* at 188, 121 S.Ct. 675 (internal quotations omitted), were excised from the scope of the CWA by the *SWANCC* decision. *Id.* at fn. 14, 121 S.Ct. 675.

5. *SWANCC* also called the 1986 regulations into question. The Supreme Court expressly refused to give deference to the Corps' regulations. *SWANCC,* 531 U.S. at 170, 174, 121 S.Ct. 675 [11]. According to the Supreme Court, "The Corps' *original* interpretation of the CWA, promulgated two years after its enactment, is inconsistent with" its new regulations." *Id.* at 168, 121 S.Ct. 675 (emphasis in original). In those original regulations, the 1974 regulations, the Supreme Court pointed out that the Corps "emphasized that '[i]t is the water body's capability of use by the public for purposes of transportation or commerce which is the determinative factor [in deciding jurisdiction].' 33 C.F.R. § 209.260(e)(1)." *Id.* The Supreme Court noted that there was nothing in the legislative history to signify that "Congress intended to exert anything more than its commerce power over navigation." *SWANCC,* 531 U.S. at 168 n. 3, 121 S.Ct. 675.

6. Even before *SWANCC* was decided, the Fourth Circuit held that the Corps exceeded its authority under the CWA. In *United States v. Wilson,* 133 F.3d 251 (4th Cir.1997), the Fourth Circuit held that the Corps exceeded its congressional authorization under the CWA when it promulgated 33 C.F. R. § 328.3(a)(3) [12], defining "waters of the United States" to include intrastate waters which need not have anything to do with navigable or interstate waters. Therefore, the Fourth Circuit held that 33 C.F. R. § 328.3(a)(3) is invalid. The Fourth Circuit stated, "Absent a clear indication to the contrary, we should not lightly presume that . . . Congress authorized the [Corps] to assert its jurisdiction in such a sweeping and constitutionally troubling manner. Even as a matter of statutory construction, one would expect that the phrase 'waters of the United States' when used to define the phrase 'navigable waters' refers to waters which, if not navigable in fact, are at least interstate or closely related to navigable or interstate waters." *Wilson,* 133 F.3d at 257.

7. "Where an administrative interpretation of a statute invokes the outer limits of Congress' power, we expect a

---

ies extending off of the main stems of these tributaries." 33 C.F.R. § 209.120(d)(2)(ii)(e)

11. "We thus read the statute as written to avoid the significant constitutional and federalism questions raised by respondents' interpretation, and therefore reject the request for administrative deference." *SWANCC,* 531 U.S. at 174, 121 S.Ct. 675.

12. 33 C. F.R. § 328.3(a)(3) defines "waters of the United States" to include:

"All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which *could affect* interstate or foreign commerce including any such waters;

(i.) Which are or could be used by interstate or foreign travelers for recreational or other purposes; or

(ii.) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or

(iii.) Which are used or could be used for industrial purpose by industries in interstate commerce." (Emphasis in *Wilson,* 133 F.3d at 257).

clear indication that Congress intended that result." *SWANCC*, 531 U.S. at 172, 121 S.Ct. 675. This requirement stems in part from the assumption that Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional authority. *Id.* Additionally, the Corps has re-interpreted its authority under the CWA several times since its passage, further pushing the limit of congressional authority with each new set of regulations. Therefore, at least as to its 1986 and later adopted regulations, the Corps is not entitled to administrative deference under *Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) [13].

■ 8. The Corps has not carried its burden of factually proving a sufficient connection between the wetlands on the Property and navigable waters or waters of the United States. Surface water leaving the Property must pass through miles—via (1) a spur ditch; (2) the eastern, manmade I–64 drainage ditch; (3) a culvert under I–64; (4) the western, manmade I–64 drainage ditch (portions of which were indisputably constructed through "dry lands"); and (5) non-navigable parts of Stoney Run—before finding navigable waters. The Corps argued that each segment of this path qualified as "waters of the United States" under the 1986 regulations. The Corps relied at trial exclusively on this "surface water connection" or "hydrological connection" for jurisdiction, although neither of those terms are included in even the 1986 regulations. Further, were the Court to allow this "surface water connection" to suffice for jurisdiction, any property connected by a drainage pipe or culvert to navigable waters would fall under the Corps' jurisdiction, for the Corps argues that a culvert or storm drainage pipe connection from wetlands to a tributary to navigable waters is a sufficient surface water or hydrological connection. In fact, it argues that a culvert or storm drainage pipe meets its newest definition of a tributary. The arbitrariness of this position is illustrated by the Corps' evidence regarding the wetlands east of Jefferson Avenue, which were historically a portion of the wetlands on the Property but whose hydrological or surface water connection was severed by the construction of Jefferson Avenue. The Corps evidence opines that Jefferson Avenue severs this connection and thereby eliminates the easterly wetlands from Corps jurisdiction since there is no culvert connecting them to the Property. Such a rule leads to situations where wetlands which otherwise would be under Corps jurisdiction are rendered non-jurisdictional by the construction of a road or other manmade obstruction. Conversely, should a storm drain be installed under Jefferson Avenue the easterly wetlands would be hydrologically reconnected to the Property and allegedly become jurisdictional. Thus, wetlands could alternately become jurisdictional or non-jurisdictional in tandem with adjacent road and storm drainage construction.

■ 9. Even if the Corps had proven factually that under the 1986 regulations the wetlands on the Property would be considered jurisdictional, these rules which it seeks to apply have far exceeded the grant of authority by Congress in the CWA. The multiple changes the Corps has

**13.** The "phases" discussed by Justice Stevens in his *SWANCC* dissent, 531 U.S. at 188, fn. 14, 121 S.Ct. 675, are identical to the "phases" outlined in the preamble to the 1975 regulations. 40 Fed.Reg. 31,320–21 (1975). The fact that Justice Stevens also uses pre–1986 regulations in interpreting the scope of the CWA further supports the contention that only pre–1986 regulations are entitled to administrative deference under *Chevron.*

made to its CWA regulations have substantially increased the reach of its regulatory powers. For example, the 1974 regulations used the term "navigable waters of the United States" to define "the scope and extent of the regulatory powers" of the Corps. 33 C.F.R. § 209.260(b) (1974). The Corps used a limited definition for "navigable waters of the United States," which restricted their jurisdiction to waters which "are subject to the ebb and flow of the tide and/or are presently, or have been in the past, or may be in the future susceptible for use for purposes of interstate or foreign commerce." 33 C.F.R. § 209.120(d)(1) (1974). However, by 1986, the Corps had distinguished the terms "navigable waters" and "waters of the United States," 33 C.F.R. § 320(d) (1986), given the term "waters of the United States" a far more expansive definition than "navigable waters," 33 C.F.R. § 328.1 (1986), and determined that the more expansive "waters of the United States" would now define the scope of their jurisdiction under the CWA. *Id.* In adopting these changes, it usurped Congress' authority to determine the Corps' jurisdiction. Additionally, the Corps replaced the limited term "navigable waters" with the expansively defined term "waters of the United States" in several other places throughout the regulations, further expanding its own jurisdiction. *See e.g.* 33 C.F.R. 209.120(b)(7) (1974) and 33 C.F.R. § 209.120(b)(7) (1986); 33 C.F.R. § 209.120(c) (1974) and 33 C.F.R. § 209.120(c) (1986); 33 C.F.R. § 209.120(d)(3) (1974) and 33 C.F.R. § 323.2(c) (1986); 33 C.F.R. § 209.120(e)(2) (1974) and 33 C.F.R. § 323.3(a) (1986).

10. Although the 1986 regulations state that the Corps generally excludes nontidal drainage and irrigation ditches excavated on dry land from its definition of tributaries over which it asserts jurisdiction, it reserves the power to claim jurisdiction over such ditches on a "case-by-case basis." 51 Fed.Reg. 41,217 (1986). In other words, the 1986 regulations have expanded the Corps' power to the point where it may give itself jurisdiction even over the waters that the regulations define as generally not qualifying under the expansively-defined term "water of the United States." The Corps does not indicate in the regulations how it will go about making such a "case-by-case" determination. Thus, there are no definable limits to the Corps' definition of tributaries over which it possesses jurisdiction. *See Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (stating that due process requires insufficiently clear regulations be held void for vagueness); *See also Bullfrog Films, Inc. v. Wick,* 847 F.2d 502, 514 (9th Cir.1988) (holding that United States Information Agency ("USIA") regulations were unconstitutionally vague because "The regulations enable USIA officials to act in an arbitrary and discriminatory manner in granting or denying permits and still be completely within the scope of their regulations ... This kind of unfettered discretion is patently offensive to the notion of due process.") (internal quotations omitted).

11. The legislative power is vested in Congress. It cannot be abdicated or transferred to others. Separation of Powers between the three branches of government requires that the enactment of a statute be a legislative function which cannot be transferred to an administrative body. Since promulgating the 1974 regulations, Congress has not passed a statute granting the Corps any additional authority under the CWA. However, by dramatically expanding its own authority through amendments to its own regulations, the Corps has in effect amended the CWA, thereby usurping the power of Congress.

While expanding its authority through new regulations may be more expedient than convincing Congress to do so through properly enacted legislation, it is not permissible for the Corps to take a shortcut by continually redefining regulatory terminology and therefore its own jurisdiction.

Albeit speaking in dissent, the language chosen by Circuit Judge Widener in *United States v. Baker*, 45 F.3d 837, 850 (4th Cir.1995) is instructive. Judge Widener stated:

> "The Virginia Court, in addressing the delegation of legislative power, has addressed the importance of not approving shortcuts on account of administrative convenience, and we should heed that admonition. In *Thompson v. Smith*, 155 Va. 367, 154 S.E. 579, 584 (1930), the Court stated:
>
> It is a fundamental principle of our system of government that the rights of man are to be determined by the law itself, and not by the let or leave of administrative officers or bureaus. This principal ought not to be surrendered for convenience or in effect nullified for the sake of expediency."

 12. The Court FINDS that when Congress passed the CWA, it did not intend for the Corps to greatly expand what qualifies as jurisdictional waters of the United States. In addition, the Court FINDS that when Congress passed the CWA, it was not Congress's intent to vest the discretion in the Corps to decide on a case-by-case basis which ditches constructed partially through dry lands and which culverts should be defined as tributaries to

waters of the United States [14]. However, under 51 Fed.Reg. 41,217 (1986), this is precisely the scope of authority the Corps has granted itself.

13. The Corps, in exerting jurisdiction over the wetlands on the Property, has exceeded the authority granted to it by Congress. The Supreme Court in *SWANCC* made it clear that the 1974 regulations, promulgated two years after the CWA's enactment, are more consistent with the intent of Congress. *SWANCC.* 531 U.S. at 168, 121 S.Ct. 675. These regulations focused on "navigable waters" and the "water body's capability of use by the public for purposes of transportation or commerce." 33 C.F.R. §§ 209.120(d)(1), 209.260(e)(1) (1974). The Supreme Court noted that Congress intended to only exert its "commerce power over navigation." *SWANCC*, 531 U.S. at fn 3, 121 S.Ct. 675. In the case at bar, only by multiple drainage ditches, a culvert under a highway, and miles of non-navigable waters, are the wetlands on the Property even remotely connected to navigable waters or a water body capable of use by the public for purposes of transportation or commerce. Further, the wetlands on the Property bear no relation to the commerce power over navigation. Therefore, the Court FINDS that the wetlands on the Property fall outside the scope of the CWA.

14. The Court agrees with the sweep of *SWANCC* as explained in the dissent written by Justice Stevens and joined by three other Justices. Although not essential to the holding, Justice Stevens opined that

---

**14.** It is noteworthy that in closing argument counsel for the Corps relied on the "case by case" language from the 1986 definition of tributaries. The argument was generally that although the evidence clearly proved that the ditch abutting the westerly side of I–64 was constructed partially through dry land, the Corps had jurisdiction over this link to the Property because it had determined that juris-

diction was appropriate "in this case." The preamble to the 1990 definition of tributaries specifies that such ditches are jurisdictional unless they are "... constructed entirely in upland areas ..." 65 Fed.Reg. 12,824–825 (2000). It appears that even the Corps own attorneys have difficulty in keeping pace with these ever-changing regulations.

*SWANCC* excluded wetlands and tributaries that are not contiguous or adjacent to navigable waters from the scope of the Corps' jurisdiction. *SWANCC*, 531 U.S. at 188, fn. 14, 121 S.Ct. 675. The wetlands on the Property are not adjacent to navigable waters by any reasonable definition of adjacency. Further, the Corps argues that the spur ditch, the two I–64 drainage ditches and the culvert under I–64 qualify as tributaries. However, even if the Court were to accept the 1986 regulations and find that the ditches and culvert can be so defined, none of these alleged tributaries are contiguous or adjacent to navigable waters or waters of the United States. Thus, the Court FINDS that *SWANCC* alone eliminates any claim of jurisdiction by the Corps in this case under any permissible interpretation of the facts as presented by the Corps.

15. As in the Fourth Circuit's holding in *Wilson*, the Army Corps of Engineers exceeded its congressional authorization under the CWA. In this case, the Corps did not have congressional authorization to regulate the wetlands on the Property. Accordingly, the Court FINDS that the Corps did not have jurisdiction to regulate the wetlands on the Newdunn Property and Newdunn was not required to obtain a permit under the CWA prior to conducting the activities delineated in the Corps' Complaint.

16. In determining whether the Court has jurisdiction to decide if Treacy and the Board possessed jurisdiction over the Property, the Court FINDS that the nature and timing of Treacy's filing of *Treacy v. Newdunn*, Civil Action No. 4:01cv86, establishes that this filing was in reaction to this Court's issuance of a Preliminary Injunction in *United States v. Newdunn*, Civil Action No. 2:01cv508. Further, since, in determining this issue, the Court must decide whether the Board's jurisdiction is dependant on that of the Corps, the paramount issue in the two cases are identical and judicial economy encourages consolidation.

17. The holding in *SWANCC* affirms that the State has broader authority to regulate wetlands within its borders than does the Corps under the CWA. However, in this case, Treacy has been unable to show that the Virginia Legislature has, at this time, granted regulatory authority independently of the Corps' jurisdiction.

18. The enabling legislation relied on by Treacy, Va.Code 62.1–44.5 and 62.1–44.15:5 (the "state statute"), was adopted prior to the Supreme Court's decision in *SWANCC*, when many federal courts had interpreted the reach of the Corps' jurisdiction more broadly than that permitted under *SWANCC*'s holding. Therefore, it was logical at the time the Virginia legislature passed this statute to base its jurisdiction upon the Corps' seemingly unlimited jurisdiction.

19. The state statute defines wetlands as land so delineated by the Corps and over which the Corps has jurisdiction. The statute reads in part, "Any delineation accepted by the U.S. Army Corps of Engineers as sufficient in its exercise of jurisdiction pursuant to § 404 of the Clean Water Act shall be determinative of the geographic area of that delineated wetland." Va.Code § 62.1–44.15:5(D).

20. Va Code § 62.1–44.15:5(A) states, "Issuance of a Virginia Water Protection Permit shall constitute the certification required under § 401 of the Clean Water Act."

21. Va.Code § 62.1–44.15:5(B) states, "The Board shall, after providing an opportunity for public comment, issue a Virginia Water Protection Permit if it has determined that the proposed activity is consistent with the provisions of the Clean Water Act ... "

22. The term "wetlands" is defined identically by state statute as by the Corps' regulations. 33 C.F.R. § 328.3(b) and Va.Code § 62.1–44.3 defines "Wetlands" as "those areas that are inundated or saturated by surface or groundwater at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs and similar areas."

23. The language in the state statute defining wetlands as land so delineated by the Corps and over which the Corps has jurisdiction under the CWA, Va.Code § 62.1–44.15:5(D), and establishing the permitting process as coexistent with the permit required under the CWA, Va.Code §§ 62.1–44.15:5(A) and (B), makes it clear that the state statute is coextensive with the CWA.

24. The fact that the term "wetlands" is defined identically by the state statute as by the Corps regulations, 33 C.F.R. § 328.2(b) and Va.Code § 62.1–44.3, supports this interpretation of the state statute.

25. The language used by the VDEQ and the Board proves that they have been consistently relying on the jurisdiction of the Corps in asserting state jurisdiction. In a letter dated July 31, 2001 to Newdunn's counsel by VDEQ counsel, the VDEQ explicitly based its jurisdiction on the Corps' jurisdiction. In both the Emergency Special Order issued on June 25, 2001 and Final Special Order issued on October 4, 2001, the VDEQ used the Corps' claim of jurisdiction over the Property as its first Finding of Fact, on which it based its own jurisdiction. Surprisingly, the October 4, 2001 Final Special Order used this language even after the Court discussed the VDEQ's apparent dependence on Corps' jurisdiction in its August 31, 2001 Order. There was no reason for the VDEQ to repeatedly use this language unless Treacy was relying on it in asserting jurisdiction.

26. The fact that weeks before trial, on February 8, 2002 the Board issued a Supplemental Final Special Order that for the first time omitted this language is unpersuasive. By that time, the Court had cited this language in several Orders and at several hearings for the proposition that Treacy's actions were dependent upon the Corps' jurisdiction, in spite of the arguments of Treacy's counsel to the contrary. This omission at such a late date demonstrates that the language was important to the Board's prior decisions, and appears to be an effort to circumvent the prior findings of the Court on this issue.

27. Therefore, the actions of and language used by the VDEQ and the Board support the Court's interpretation of the statute as granting the state jurisdiction coextensive with Corps jurisdiction under the Clean Water Act.

28. Accordingly, the Court **FINDS** that Treacy and the Board exercised the State's jurisdiction over the Property based on the Corps' claim that the Property contains jurisdictional wetlands under the CWA.

29. Having found that the Corps has no jurisdiction, it follows that the Court **FINDS** that Treacy, acting on behalf of the Board, has no jurisdiction.

30. Having found Treacy and the Board lack jurisdiction, the Court **DECLINES** Newdunn's request to decide whether its activities constituted a violation of the state's regulatory statute. The Court also **DECLINES** to consider the constitutionality under state law of the state regulatory scheme, an issue which Newdunn raised for the first time at trial. Both of these issues are better left to the appropriate state court or agency.

31. Since neither the Corps, nor Treacy and the Board, have jurisdiction over the wetlands on the Newdunn Property, the Court **ENTERS JUDGMENT** for the **DEFENDANTS**.

## IV. Summary

Congress passed the CWA in 1972. The Corps adopted regulations interpreting that act in 1974. Although since 1972 Congress has not granted the Corps additional jurisdiction, the Corps has made multiple changes to its original regulations expanding its jurisdiction. The 1986 regulations adopted by the Corps substantially expanded the definition of jurisdictional waters and, in doing so, granted itself dramatically more authority. In making these changes, it usurped Congress' authority to determine the Corps' jurisdiction. Accordingly, the Court **FINDS** that the Corps did not have authority under the CWA to adopt the 1986 regulations or any regulations adopted thereafter since the 1986 regulations are not entitled to administrative deference under *Chevron*, 467 U.S. 837, 104 S.Ct. 2778.

The Court **FINDS** that the Corps did not have jurisdiction over the Property under the regulations existing prior to 1986. Further, the majority opinion in *SWANCC* makes it clear that the Supreme Court excised the Property from the scope of the CWA, even under the 1986 regulations, as the wetlands on the Property are not adjacent to navigable waters or waters of the United States by any reasonable definition of adjacency.

Accordingly, the Court **FINDS** that even under the 1986 regulations as interpreted by *SWANCC*, the Corps still has not proven a sufficient connection between the property and navigable waters or waters of the United States to establish jurisdiction over the Property.

Therefore, the Court **FINDS** that the Corps lacks jurisdiction under the CWA to regulate the Property.

It may well be that the Corps' amendments to its regulations are meritorious in attempting to protect the environment, although in this instance, the Corps' interpretation of its jurisdiction is more likely to harm than help the Chesapeake Bay. However, the fact that the Corps has a meritorious scientific basis for expanding its jurisdiction in an effort to protect the environment does not authorize it to usurp the function of the legislative branch for the sake of expediency. It is incumbent upon the Courts to prevent the Corps from shortcutting the legislative process.

The enabling legislation relied on by Treacy was adopted prior to the Supreme Court's decision in *SWANCC*, when many Federal Courts had interpreted the reach of the Corps' jurisdiction more broadly than that permitted under *SWANCC*'s holding. The language of the state statute makes it clear that the statute granting the state jurisdiction is coextensive with the CWA. The actions of and language used by the VDEQ and the Board further supports this interpretation of the state statute. The Court **FINDS** that Treacy and the Board sought to exercise the State's jurisdiction over the Property based on the Corps' claim that the Property contains jurisdictional wetlands under the CWA. In determining the question of the Court's jurisdiction to decide this issue, the Court **FINDS** that the nature and timing of Treacy's filing of *Treacy v. Newdunn*, Civil Action No. 4:01cv86, establishes that this filing was in reaction to this Court's issuance of a Preliminary Injunction in *United States v. Newdunn*, Civil Action No. 2:01cv508. Further, since the Board's jurisdiction is dependant on that of the Corps, the paramount issue in the two cases is identical and judicial economy

encourages consolidation. Having found that the Corps has no jurisdiction, it follows that the Court **FINDS** that Treacy, acting on behalf of the Board, has no jurisdiction. Having found Treacy and the Board lack jurisdiction, the Court **DECLINES** Newdunn's request to rule upon the issue of whether its activities constituted a violation of the state's regulatory statute. This issue is better left to the appropriate state agency or court. The state court is also the more appropriate forum to decide the constitutionality under state law of the state regulatory scheme, an issue which Newdunn raised for the first time at trial.

Since neither the Corps, nor Treacy and the Board, have jurisdiction over the wetlands on the Newdunn Property, the Court **ENTERS JUDGMENT** for the **DEFENDANTS**.

The Clerk is **REQUESTED** to send a copy of this Order to all counsel of record.

It is so **ORDERED.**